

FILED
DEC 13 2017
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWARD DEAN HOHNER,<br><br>      Petitioner,<br>v.<br>RICHARD IVES, Warden,<br><br>      Respondent. | Case No.: 15cv955-JLS(KSC)<br><br>**REPORT AND RECOMMENDA-TION RE PETITION FOR WRIT OF HABEAS CORPUS** |

  Petitioner Edward Dean Hohner, a state prisoner proceeding *pro se*, filed a Petition for Writ of Habeas Corpus and a First Amended Petition challenging his conviction in San Diego Superior Court Case No. SCD 216918. [Doc. Nos. 1, 7.] The First Amended Petition raises a single claim – whether the trial court violated petitioner's Sixth Amendment right to confrontation when it admitted rebuttal testimony by an investigator about conversations he had with the mother of a key prosecution witness. [Doc. No. 7, at pp. 16-25.]

  This Court has reviewed the First Amended Petition [Doc. No. 7]; respondent's Answer and supporting Memorandum of Point and Authorities [Doc. No. 13]; the Lodgments submitted by respondent, including the state court record [Doc. No. 14]; and petitioner's Traverse, which is entitled "Opposition to Respondent's Answer." [Doc. No.

1

15]. For the reasons outlined below, IT IS HEREBY RECOMMENDED that the District Court DENY the Petition.

## ***PROCEDURAL HISTORY***

By Amended Information filed on August 3, 2009, petitioner was charged with two counts of murder with a handgun during the commission of a robbery on February 21, 1997. The two victims were Rolando Cebreros (Rolando) and Francisco Villalobos (Francisco). [Doc. No. 14-2, at pp. 20-21.]

On April 30, 2012, petitioner was convicted by a jury as charged. [Doc. No. 14-3, at pp. 63-67; Doc. No. 14-1, at pp. 5-6.] The trial court sentenced petitioner to life in prison without the possibility of parole. [Doc. No. 14-3, at p. 89.]

On February 26, 2013, petitioner filed his Opening Brief on appeal with the California Court of Appeal. One of petitioner's arguments was that the trial court committed prejudicial error and violated his constitutional rights under the Confrontation Clause of the Sixth Amendment when it allowed Special Agent James M. Bird (Agent Bird) to testify about conversations he had with Silvia Camarena. [Doc. No. 14-12, at pp. 43-52.] In an unpublished decision filed on December 26, 2013, the California Court of Appeal affirmed the judgment of conviction. *People v. Hohner*, Case No. D062097 (Cal. Ct. App. Dec. 26, 2013). [Doc. No. 14-15, at pp. 1-33.]

Next, petitioner filed a Petition for Review with the California Supreme Court on February 5, 2014. [Doc. No. 14-16, at pp. 1-32.] Once again, petitioner argued that the trial court violated his right to confrontation under the Sixth Amendment when it allowed Agent Bird to testify about his conversations with Silvia Camarena. [Doc. No. 14-16, at pp. 16-19.] On April 16, 2014, the California Supreme Court summarily denied the Petition for Review. *People v. Hohner*, Case No. S216350 (Cal. Supreme Ct. Apr. 16, 2014).

Thereafter, on April 30, 2015, petitioner filed his original Petition for Writ of Habeas Corpus in this Court. [Doc. No. 1.] However, the original Petition included several unexhausted claims [Doc. No. 2], so petitioner requested and was granted a stay,

2

so he could exhaust his state court remedies and then file an amended petition that only included exhausted claims. [Doc. No. 4, at pp. 1-2.] However, after a lengthy stay, petitioner filed a First Amended Petition for Writ of Habeas Corpus on September 29, 2016 that only includes the single exhausted claim described above. [Doc. No. 7.] An Answer/Response to the First Amended Petition and the state court record were then filed on February 24, 2017. [Doc. Nos. 13 and 14.] On April 4, 2017, petitioner filed his Response (Traverse). [Doc. No. 15.]

## *FACTUAL BACKGROUND*

At trial, Maria Cebreros, who was married to Rolando, testified that in 1997 Rolando made money selling marijuana. [Doc. No. 14-6, at pp. 110-111.] On February 20, 1997, she and Rolando "stopped by" petitioner's house in Oceanside. She stayed in the car while Rolando went inside for 20 to 30 minutes. [Doc. No. 14-6, at pp. 112-113.] Rolando told Maria he planned to sell some drugs to petitioner at this house. [Doc. No. 14-6, at pp. 113-114.] Early the next morning, February 21, 1997, Maria testified that Rolando had two visitors: (1) the other victim in this case, Francisco Villalobos, and (2) Don Lupe Cervantes (Lupe), who was Rolando's supplier. [Doc. No. 14-6, at pp. 114-115.]

Rolando left home about 10:00 a.m. and told Maria he was going first to pick up the drugs and then take them to petitioner's house in Oceanside and pick up $50,000 in cash. [Doc. No. 14-6, at p. 116.] Rolando called Maria at mid-day from his cell phone to say he arrived at petitioner's house. [Doc. No. 14-6, at pp. 117-118.] He called Maria again about 7:30 p.m. from a phone at petitioner's house because the battery in his cell phone was low. [Doc. No. 14-6, at p. 119.] This time, Rolando told Maria that he was waiting for the money to arrive and then he would head home. [Doc. No. 14-6, at p. 119.] Maria called him back about two hours later but was unable to reach him, and he never returned home. [Doc. No. 14-6, at pp. 119-120.]

Both Rolando and Francisco were reported missing, and their disappearance then became the subject of an investigation. [Doc. No. 14-6, at pp. 138-148; Doc. No. 14-7, at

3

pp. 12-13.] Petitioner told investigators that Rolando and Francisco were at his house for about an hour on February 21, 1997 to play pool and drink beer. He later added that they were there to drop off 120 pounds of marijuana, and he paid Rolando $48,000. [Doc. No. 14-7, at pp. 16-17; Doc. No. 14-8, at pp. 126-128.] Petitioner also admitted that Rolando made a phone call to his wife from a phone inside the home. [Doc. No. 14-7, at p. 18; Doc. No. 14-15, at pp. 3-4; Doc. No. 14-8, at p. 128.]

Cynthia Araiza (Cynthia), petitioner's live-in girlfriend at the time of the murders, originally told investigators she did not know anything about the disappearance of Rolando and Fernando. [Doc. No. 14-7, at pp. 28-30; Doc. No. 14-8, at p. 119; Doc. No. 14-7, at p. 94.] However, Agent Bird of the FBI, who became involved in the investigation of the case in 1998, testified that on the day Cynthia was scheduled to testify before the grand jury in 2004, she became very emotional and decided to tell what really happened. According to Agent Bird, Cynthia indicated she had changed her life, was not the same person, and wanted to do the right thing. [Doc. No. 14-8, at p. 120.] By the time of trial in 2012, Cynthia had re-established contact with petitioner and was a reluctant witness for the prosecution. [Doc. No. 14-7, at p. 115; Doc. No. 14-8, at pp. 84-88, 122.] During her trial testimony, Cynthia repeatedly responded that she did not recall events in the past, but she was then repeatedly confronted with her prior testimony.[1] [Doc. No. 14-7, at pp. 28-52, 61; Doc. No. 14-15, at p. 4.]

In her prior testimony, Cynthia stated that on February 21, 1997, Arthur Camarena (Arthur), who was a friend of petitioner's, was staying in a "granny flat" in the back of the house where she lived with petitioner in Oceanside. [Doc. No. 14-7, at pp. 43-45.] When she arrived at home on February 21, 1997, she noticed Rolando's white Volkswagon Jetta parked at the house. [Doc. No. 14-7, at pp. 52-54, 56.] She went into

---

[1] The record indicates that Cynthia testified in front of a grand jury on September 23, 2004 and at the preliminary hearing in 2009. [Doc. No. 14-7, at pp. 38, 61, 85.]

4

the house and then to the "granny flat," where petitioner, Camarena, and Rolando were playing pool. [Doc. No. 14-7, at pp. 61-63.] Petitioner told her to go back in the house but she refused. [Doc. No. 14-7, at pp. 65-66.] Somehow she learned that another individual (Francisco) was out getting food. [Doc. No. 14-7, at pp. 66-67.]

According to Cynthia, she was sitting with petitioner in the "granny flat" when he stood up and shot Rolando in the back of the head. [Doc. No. 14-7, at pp. 68-69.] Cynthia ran back into the house and looked out a window toward the "granny flat" where she saw petitioner dragging the body into the bathroom. Petitioner then went into the garage. [Doc. No. 14-7, at pp. 70-74.] Next, she heard the side gate click and realized Francisco was returning with fast food and went into the garage. [Doc. No. 14-7, at pp. 74-78.] A few minutes later she heard another gunshot. She immediately picked up her daughter and left the house. [Doc. No. 14-7, at pp. 78-79.]

When Cynthia returned to the house the next day, the white Volkswagon Jetta was no longer there. [Doc. No. 14-7, at p. 80.] She asked petitioner what happened to the car, and he told her he took care of it. She also saw that petitioner had two gallons of liquid chemicals in the garage and was cleaning the bathroom. [Doc. No. 14-7, at pp. 81-82; Doc. No. 14-8, at pp. 122-123.]

Arthur's testimony was fairly consistent with Cynthia's testimony. He testified that he had known petitioner for many years and that in February 1997 he was staying in the "granny flat" in back of petitioner's house. [Doc. No. 14-7, at pp. 151-155.] Inside the "granny flat," there was a full bathroom, a couch, a pool table, and a chair. [Doc. No. 14-7, at pp. 155-156.] Arthur is fluent in Spanish, and petitioner asked him to act as a translator during the drug transaction on February 21, 1997, because Rolando and Francisco did not speak English very well. [Doc. No. 14-7, at pp. 156-157.] Arthur saw Rolando and Francisco arrive in a white Jetta, and he opened the gate for them on the side of the main house and took them to the "granny flat," where they all started to talk and play pool. [Doc. No. 14-7, at pp. 158-160.] Although he did not pay close attention to

the names, he believes it was Rolando who was hungry and left to get food while he continued to play pool with the other guy that stayed.[2] [Doc. No. 14-7, at pp. 160-163.]

While he was standing at the back right corner of the pool table, Arthur saw petitioner shoot one of the victims in the head from behind. The victim fell straight back onto the floor. At the time of the shooting, Cynthia was standing next to petitioner, but she screamed and ran toward the main house after the shot was fired. [Doc. No. 14-7, at pp. 164-166.] Arthur said he stood there in shock as he did not have any prior knowledge that there would be a shooting. [Doc. No. 14-7, at p. 167; Doc. No. 14-8, at pp. 39-40.] For his testimony in the case, Arthur was given "use immunity" to tell what he knew. [Doc. No. 14-8, at pp. 26-27]

After the shooting, Arthur helped by moving the body into the bathroom in the "granny flat." [Doc. No. 14-8, at p. 28.] About ten minutes later, he saw the other guy come back through the side gate carrying food and then walk into the garage with petitioner. He then heard "a pop" and saw petitioner come out of the garage and go into the house. [Doc. No. 14-8, at pp. 29-31.] After a while, he and petitioner went into the garage together, and Arthur saw the victim laying on the ground with a wound in his head. [Doc. No. 14-8, at pp. 32-33.]

Petitioner and Arthur then drove the white car to a nearby safe house to "stash the weed." [Doc. No. 14-8, at pp. 34-35.] Later, they drove the white car back to the house and parked it in the garage. They then put the bodies in the trunk. [Doc. No. 14-8, at p. 35.] Shortly thereafter, they drove the white car all the way to Arizona. Petitioner drove the white car, and Arthur followed in petitioner's truck. [Doc. No. 14-8, at pp. 36-37.] In Arizona, after they passed through Yuma, they stopped in a deserted area. He waited there while petitioner drove off in the white car with the bodies in the truck. [Doc. No.

---

[2] Cynthia and Camareno told different stories as to which victim was shot first. However, investigators concluded that Camareno simply had the two victims confused as he did not know either one of them. [Doc. No. 14-8, at p. 136.]

14-8, at p. 38.] About an hour later, he saw petitioner walking back toward the truck, and they drove home. [Doc. No. 14-8, at p. 39.]

Eric Hamilton (Eric), a friend of petitioner's, testified that he stopped by petitioner's house on the afternoon of February 21, 1997, because he was looking for marijuana to sell to a client. Petitioner said that some guy that he met in a car shop in San Diego was going to bring him 120 pounds and he was going to "rip him off for it, or jack him," meaning that he was going to rob the guy and not pay him for the marijuana. [Doc. No. 14-8, at pp. 100-105.] Eric asked petitioner if he could be involved and share in the proceeds, but petitioner declined his offer. [Doc. No. 14-8, at p. 105.] Eric then talked to petitioner later that night, and asked him "how it went," and petitioner indicated "it didn't go well." [Doc. No. 14-8, at p. 106.] Petitioner said he would tell Eric more about it later. [Doc. No. 14-8, at p. 106.] On February 22, 1997, petitioner went to the store where Eric worked, and Eric asked petitioner what happened. Petitioner indicated he had 120 pounds of marijuana but "there's some things you best not know about." [Doc. No. 14-8, at p. 107.] The next day, Eric went to petitioner's house and noticed everything was wet in the garage and some cleaning products were out. [Doc. No. 14-8, at p. 108.]

Several months later, Eric testified he was watching a movie with petitioner and someone in the movie was shot in the head. The scene in the movie showed blood "squirting out everywhere." [Doc. No. 14-8, at p. 108.] Petitioner commented that "it doesn't happen like that, that the brain comes out the nose." [Doc. No. 14-8, at p. 109.] Several years later, Eric and petitioner were talking about "killing," and petitioner commented that he had "done it before and gotten away with it." [Doc. No. 14-8, at pp. 109-110.]

The defense presented a number of character and impeachment witnesses to attempt to establish that Cynthia, Arthur, and Eric could not be trusted. [Doc. No. 14-15, at p. 6; Doc. No. 14-9, at pp. 30 *et seq.*] One of these witnesses was Barbara Peterson (Barbara), a property manager. Barbara testified that Silvia Camarena (Silvia) lived in

7

one of the apartments she managed. Silvia is Arthur's mother. [Doc. No. 14-9, at pp. 73-74.] Barbara testified that she had known Arthur since 1998 and that he had a reputation in the community for being dishonest. [Doc. No. 14-9, at pp. 74-75.]

Barbara also testified that in 2008 Arthur was allowed to move into the apartment with his mother, Silvia. From 2008 to 2010, Barbara had frequent contact with Arthur. [Doc. No. 14-9, at p. 75.] During the course of this case, Barbara also had contact with Agent Bird of the FBI, because he made a number of visits to Silvia's apartment. Peterson noticed there was a "lingering relationship" between Silvia and Agent Bird, even though Agent Bird had retired. According to Peterson, Agent Bird appeared to take a personal interest in Silvia and Arthur. [Doc. No. 14-9, at p. 76.]

Immediately following Barbara's testimony, the prosecutor requested a "sidebar" with the trial court that was unreported. [Doc. No. 14-9, at p. 77.] On cross-examination, the prosecutor then asked Peterson if she knew why Agent Bird had "so much" contact with Silvia. [Doc. No. 14-9, at p. 77.] Barbara testified that she did not have any idea why Agent Bird seemed to have continuing contact with Silvia. [Doc. No. 14-9, at p. 77.]

In a later sidebar, the trial court asked counsel whether there were any other "brewing issues we need to discuss?" [Doc. No. 14-9, at p. 145.] Petitioner's counsel stated there was a "brewing issue" about the potential admission of a letter petitioner wrote to Silvia. [Doc. No. 14-9, at p. 145.] If the prosecutor wanted the letter admitted to show Silvia perceived the letter as threatening, petitioner's counsel argued that the entire letter should be admitted to show it was not "threatening" or "intimidating." [Doc. No. 14-9, at p. 145.] To make the record clear, the trial court indicated that "the start of this discussion" was in a prior "off-the-record discussion." [Doc. No. 14-9, at p. 146.] The trial court's understanding was that the prosecutor wanted to recall Agent Bird to explain his contacts with Silvia, because Barbara's testimony suggested that Agent Bird's "contact and development of a relationship" with Silvia and Arthur may have influenced Arthur's testimony. [Doc. No. 14-9, at p. 146.] One of the reasons for this continuing contact involved a letter Silvia received from petitioner. Therefore, the prosecutor

intended to have Agent Bird explain that Silvia felt threatened by the letter, so some of his continuing contacts with her were about the letter. [Doc. No. 14-9, at pp. 146-148.] The prosecutor indicated he did not object to admitting the entire letter as evidence. However, petitioner's counsel did object "to this whole inquiry," because Silvia "is not a witness in this case" and Agent Bird's contact with her could "mean any number of things." [Doc. No. 14-9, at p. 148.]

The trial court responded, "Well, so why did you put the evidence on? What did you think was relevant about it? . . . You raised the subject. [¶]There is no other reason for that testimony regarding the contact and/or relationship with Agent Bird other than to suggest he was attempting to influence them, influence their testimony, and that's the clear inference that was drawn from that. [¶]I mean, I'm just sitting here listening just like a juror, and that's, to me, the only inference that can be drawn from that. And if in fact that's not why he was visiting her under many of these circumstances, then that's not fair for the prosecution not to be able to explain that. So I am going to let him explain it. And if they put the evidence on regarding the letter and you want to put in the full letter to show it's not threatening, I'm going to let you do that. I'm going to let you both explain the whole circumstance, because the jury is entitled to know." [Doc. No. 14-9, at pp. 148-149.] Petitioner's counsel responded, "That's fine." [Doc. No. 14-9, at p. 149.]

Next, the prosecutor recalled Agent Bird to the stand to present rebuttal testimony, which is now the subject of petitioner's claim under the Confrontation Clause. [Doc. No. 1, at pp. 18-20; Doc. No. 14-10, at pp. 64 *et seq.*] During this rebuttal testimony, Agent Bird explained that he had contacts with Silvia in 2008 and 2009 to make sure that her son, Arthur, would be available as a witness in this case and to serve him with subpoenas to appear. He spoke with Silvia on several occasions when he was trying to locate Arthur. [Doc. No. 14-10, at pp. 65-67.] On one occasion, when Agent Bird went to Silvia's residence to deliver a subpoena for Arthur to appear at the preliminary hearing in this case, she expressed concern about a letter and envelope she received in the mail. The letter was from petitioner, and there was nothing in the letter itself that caused her any

concern. However, she was concerned about the envelope and perceived it to be a potential threat. She did not recognize the name of the sender, and the return address was from the jail. Her concern was that petitioner would send her something through another individual that she did not know. It was then determined that the individual shown as the sender had been released from jail, which worried her more: "Who is this man? He's out, he knows where I live. What could he do to me or to my family?" [Doc. No. 14-10, at pp. 65-66.] A copy of the letter and envelope were admitted as People's Exhibit 16 at trial. [Doc. No. 14-10, at p. 66.]

On cross-examination about this rebuttal evidence, petitioner's counsel asked: "And what part of that letter did [Silvia] perceive as a threat?" [Doc. No. 14-10, at p. 70.] Agent Bird responded as follows: "As I indicated, it was the idea that [petitioner] would be contacting her knowing that her son was a potential witness in the case against him, and also the fact that it was being sent through the name of a third party that she did not know and that was now not in custody any longer. She was afraid that he could show up at the house and she wouldn't even know who the person was." [Doc. No. 14-10, at p. 70.] Petitioner's counsel then asked Agent Bird whether there was anything he considered threatening in the letter. The trial court sustained a relevance objection and stated as follows: "The letter speaks for itself. The jurors are going to get to see it." [Doc. No. 14-10, at p. 71.]

## I. *Standard of Review.*

Federal habeas corpus relief is available only to those who are in custody in violation of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). "A federal court may not issue the writ on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984). "[A] mere error of state law is not a denial of due process." *Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1982) (internal quotations omitted).

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lindh v. Murphy*, 521 U.S. 320, 327 (1997). AEDPA imposes a "highly deferential standard for evaluating state-court rulings, which

10

15cv955-JLS(KSC)

demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (internal citations and quotations omitted). Under AEDPA, a habeas petition "on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim– (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)&(2). For purposes of Section 2254(d)(1), "clearly established Federal law" means "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Therefore, a lack of controlling Supreme Court precedent can preclude habeas corpus relief. *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (concluding that the state court's decision did not unreasonably apply clearly established Supreme Court law, because the relevant cases provided "no clear answer to the question presented").

The AEDPA standard is highly deferential and "difficult to meet." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Federal habeas relief may be granted under the "contrary to" clause of Section 2254 if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court "on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). The focus of inquiry under the "contrary to" clause is "whether the state court's application of clearly established federal law is objectively unreasonable." *Id.* "[A]n unreasonable application is different from an incorrect one." *Id.* In other words, federal habeas relief cannot be granted simply because a reviewing court concludes based on its own independent judgment that the state court decision is erroneous or incorrect. *Id.* Habeas relief is only available under Section 2254(d)(1) "where there is no possibility fair minded jurists could disagree that the state court's decision conflicts" with

Supreme Court precedent. *Harrington v. Richter*, 562 U.S. at 102. In addition, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

Where there is no reasoned decision from the state's highest court, Federal Courts "look through" to the "last reasoned state-court opinion" and presume it provides the basis for the higher court's denial of a claim or claims. *Ylst v. Nunnemaker*, 501 U.S. 797, 805-806 (1991). If the state court does not provide a reason for its decision, the Federal Court must conduct an independent review of the record to determine whether the state court's decision is objectively unreasonable. *Crittenden v. Ayers*, 624 F.3d 943, 947 (9th Cir. 2010). To be objectively reasonable, a state court's decision need not specifically cite or rely on Supreme Court precedent. "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]," the state court's decision will not be "contrary to clearly established Federal law." *Early v. Packer*, 537 U.S. 3, 8 (2002).

## II. *Review of Petitioner's Claim.*

### A. *Allegations in the First Amended Petition.*

Citing the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004), petitioner argues in the First Amended Petition that Silvia's statements to Agent Bird about the letter should not have been admitted through Agent Bird's testimony unless the prosecution could show Silvia was unavailable as a witness. According to petitioner, Silvia's statements to Agent Bird were "testimonial" statements offered to establish the truth of the matters asserted. [Doc. No. 7, at pp. 23-24.] Petitioner believes Silvia's statements to Agent Bird qualified as "testimonial" statements under *Crawford v. Washington*, 541 U.S. 36, because they were "made in the course of routine questioning" by a law enforcement officer while there was no "ongoing emergency." [Doc. No. 7, at p. 23.] The statements were made by Silvia to Agent Bird while he was serving a routine subpoena on her son, Arthur, but the statements had nothing to do with Arthur. Rather, the statements were about petitioner. [Doc. No. 7, at p. 23-24.] In addition, petitioner

12

15cv955-JLS(KSC)

believes that Silvia's statements were offered through Agent Bird's testimony for the truth of the matters asserted, because Agent Bird testified that Silvia "took the letter 'as a threat.'" [Doc. No. 7, at p. 23.]

Petitioner also argues that the subject testimony was prejudicial, because the evidence against petitioner was weak. In support of this argument, petitioner cites impeachment evidence, the lack of physical evidence connecting petitioner to the disappearance of the two victims, contradictory evidence, and a jury note indicating the jurors were struggling to reach a verdict and were deadlocked. [Doc. No. 7, at pp. 24-25.] Because petitioner contends that the evidence against him was weak, he believes evidence indicating he threatened the mother of a key eyewitness against him "was very damming" as it indicated "consciousness of guilt, which is quite powerful in a close case." [Doc. No. 7, at p. 25.]

### B. *California Court of Appeal's Decision.*

The California Court of Appeal concluded that petitioner forfeited any claim based on Agent Bird's rebuttal testimony, because he failed to make a specific objection in the trial court. The California Court of Appeal also considered the merits of petitioner's claim and concluded in part as follows: "[E]ven if the claims had been preserved for appellate review, any error was harmless." [Doc. No. 14-15, at pp. 18, 22-23, 24.] According to the California Court of Appeal, any error in admitting Agent Bird's rebuttal testimony was "harmless under any standard of prejudice," because the evidence of petitioner's guilt was "overwhelming." [Doc. No. 14-15, at p. 26.] It therefore appears that the California Court of Appeal assumed the admission of Agent Bird's testimony about his conversations with Silvia violated the Confrontation Clause but concluded on the merits that the error was harmless.

### C. *Procedural Bar.*

Respondent contends that petitioner is procedurally barred from having his Confrontation Clause claim considered on the merits, because he failed to make a specific objection in state court, and the California Court of Appeal rejected his claim on the

"adequate and independent" state-law ground of forfeiture. [Doc. No. 13-1, at pp. 11-14.] Under California law, a general hearsay objection is not enough to preserve a claim under the Confrontation Clause. *See, e.g., People v. Redd*, 48 Cal. 4th 691, 730 (2010). As respondent contends, the California Court of Appeal concluded under California law that petitioner forfeited his Confrontation Clause claim, because he did not articulate the legal theory for his objection to Agent Bird's testimony about his contacts with Silvia. [Doc. No. 14-15, at pp. 22-24.] As noted above, petitioner made a general objection during a sidebar conference with the trial court that Silvia was not a witness in the case but did not mention the Confrontation Clause or the right to confrontation. [Doc. No. 14-9, at p. 148.] However, it is also apparent that a prior sidebar conference with the trial court on this subject was not recorded [Doc. No. 14-9, at p. 77], so it is possible that petitioner made a more specific objection at that time.

"If a state appellate court overlooks the procedural default and considers an objection on the merits, the state has not relied on the procedural bar and the federal courts may review the claim." *Thomas v. Hubbard*, 273 F.3d 1164, 1176 (9th Cir.2001), *overruled on other grounds by Payton v. Woodford*, 299 F.3d 815 (9th Cir.2002) (*en banc*). When the state court's decision is ambiguous and "cannot be fairly characterized as merely procedural" (*i.e.*, because it considered the parties' arguments and "came to a conclusion about their merits"), the Ninth Circuit has indicated that a Federal habeas petitioner's claim should be considered on the merits. *Chambers v. McDaniel*, 549 F.3d 1191, 1197 (9th Cir. 2008). *But see Zapata v. Vasquez*, 788 F.3d 1106, 1111–1112 (9th Cir. 2015) (concluding that the petitioner's "defaulted" claim should not be considered on the merits, because the "state court expressly invoked a procedural bar" but then "went on to discuss the merits of the claim").

In this Court's view, the California Court of Appeal's decision in this case "cannot be fairly characterized as merely procedural." *Chambers v. McDaniel*, 549 F.3d at 1197. As noted above, the California Court of Appeal's decision includes a lengthy discussion of the facts surrounding petitioner's Confrontation Clause claim and clearly reaches a

14

15cv955-JLS(KSC)

determination on the merits, even though it also concludes that petitioner forfeited his claim under California law. In addition, as noted above, the record indicates it is possible that petitioner made a more specific objection to the subject testimony in an unrecorded sidebar discussion with the trial court. [Doc. No. 14-9, at p. 77.] Under these circumstances, IT IS RECOMMENDED that the District Court reject respondent's argument that petitioner's claim is procedurally barred from consideration in Federal Court and decide petitioner's Confrontation Clause claim on the merits.

### D. *Confrontation Clause.*

The Confrontation Clause of the Sixth Amendment states in part as follows: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. . . ." U.S. CONST. amend. VI. "The Confrontation Clause provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination." *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987).

In *Crawford v. Washington*, 541 U.S. 36, the defendant was charged with assault and attempted murder of a man "who allegedly tried to rape his wife." *Id.* at 38, 40. The wife, who was present during the assault on the victim, made "tape-recorded" statements "while in police custody" while she was a "potential suspect in the case." *Id.* at 40, 65. The defendant claimed self-defense at trial. The wife did not testify because of the state marital privilege, but the State sought to introduce the recorded statements to attempt to show that the defendant did not act in self-defense. *Id.* at 40. Although the defendant objected based on the Confrontation Clause, the trial court admitted the wife's recorded statements based on prior case law allowing admission of an unavailable witness's statement as long as it was trustworthy. *Id.* at 40. However, the Supreme Court concluded that the wife's statements were admitted in violation of the defendant's Sixth Amendment right to confrontation, because the defendant had "no opportunity to cross-examine her." *Id.* at 68. "Where testimonial statements are at issue," the Supreme Court

stated that "the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 68-69.

In sum, the Supreme Court in *Crawford v. Washington*, 541 U.S. 36, held that out-of-court statements by a witness that quality as "testimonial" are not admissible against the accused in a criminal trial unless the witness is unavailable and was previously subject to cross-examination by the accused. *Id.* at 59, 68. The Supreme Court in *Crawford v. Washington* further stated that the term "'testimonial' at a minimum applies to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.*

In later cases involving claims under the Confrontation Clause, the Supreme Court provided further guidance as to the scope of the term "testimonial" and distinguished it from "non-testimonial" witness statements. In *Davis v. Washington*, 547 U.S. 812 (2006), the Supreme Court considered two separate cases involving statements made by witnesses in connection with domestic disturbances. In the first case, statements were made to a 911 operator during the course of a domestic dispute. *Id.* at 817-818. The Supreme Court concluded these statements were "non-testimonial" for purposes of the Confrontation Clause. The witness "was speaking about events as they were actually happening, rather than 'describing past events,'" and viewed objectively the primary purpose of the statements "was to enable police assistance to meet an ongoing emergency." *Id.* at 827-828. Non-testimonial statements included "the operator's efforts to establish the identity of the assailant, so that the dispatch officer might know whether they would be encountering a violent felon." *Id.* at 827.

On the other hand, the Supreme Court in *Davis v. Washington*, 547 U.S. 812, acknowledged that "a conversation which begins as an interrogation to determine the need for emergency assistance" can "evolve into testimonial statements." *Id.* at 828. After the 911 operator obtained the information needed to address the emergency in this case, the perpetrator drove away from the premises, which ended the "exigency of the

moment." *Id.* at 828-829. As a result, statements made by the witness thereafter were testimonial statements entitled to the protections of the Confrontation Clause. *Id.* at 829.

In the second case considered by the Supreme Court in *Davis v. Washington*, 547 U.S. 812, police responded to a report of a domestic dispute and were told by the wife, who was standing outside the home, that "nothing was the matter." *Id.* at 819. Police then entered the home with her permission and began to separately question the husband and the wife about what happened, and the wife signed a handwritten affidavit implicating the husband, who was later charged with domestic battery. *Id.* at 820. When the wife did not appear for the husband's trial, the State called the officer to the stand over the husband's objection to recount what the wife told the officer inside the home and to authenticate the affidavit. *Id.* at 820. The Supreme Court concluded the wife's statements and the affidavit were "testimonial" for purposes of the Confrontation Clause as they were essentially the same as the statements at issue in *Crawford v. Washington*, 541 U.S. 36, even though they were made in the informal setting of the home rather than tape-recorded in an interrogation room at the police station. *Id.* at 829-830. In addition, the Supreme Court noted there was no emergency in progress and no immediate threat to the wife, and the officer questioned the wife as part of an investigation into possible criminal conduct that had already taken place. *Id.*

The Supreme Court in *Davis v. Washington*, 547 U.S. 812, summarized its holding in the case as follows:

> Statements are non-testimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 822.

On the other hand, the Supreme Court in *Crawford v. Washington*, 541 U.S. 36, clearly stated "that not all hearsay implicates the Sixth Amendment's core concerns." *Id.* at p. 51. Specifically, the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id.* at 59 n.9, citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985). In *Tennessee v. Street*, 471 U.S. 409, the defendant and a co-defendant were found guilty in severed trials of killing a neighbor during a burglary. *Id.* at 410-412. During the defendant's trial, the State relied on a confession made by the defendant during an interrogation by law enforcement officials. *Id.* at 411. However, the defendant testified at trial that he did not participate in the burglary or murder and that his confession was coerced. According to the defendant, a sheriff read him a written statement made by his co-defendant and then pressured him to repeat those admissions in his own statement. *Id.* at 411-412. The State then called the sheriff as a witness to the defendant's confession, and the sheriff was also permitted to read the co-defendant's confession to the jury to emphasize the differences between the two confessions. *Id.* On appeal, the defendant argued that admission of the co-defendant's confession violated the Confrontation Clause. *Id.* However, the Supreme Court concluded there was no violation of the Confrontation Clause, because the co-defendant's out-of-court confession was admitted for a non-hearsay purpose under traditional rules of evidence and not to prove the truth of the co-defendant's statements. According to the Supreme Court, the co-defendant's confession was not admitted "to prove what happened at the murder scene but to prove what happened when [the defendant] confessed." *Id.* at 414. In other words, the admission of the co-defendant's confession "was critical to rebut [the defendant's] testimony that his own confession was derived from [his co-defendant's confession]." *Id.* at 413. As a result, admission of the co-defendant's confession did not raise any Confrontation Clause concerns. *Id.* at 414.

In this Court's view, Silvia's out-of-court statements about the letter she received from petitioner were admitted through Agent Bird's rebuttal testimony for a non-hearsay purpose. The statements were admitted to rebut Barbara's testimony during direct

examination by the defense, because her testimony suggested that Agent Bird developed a close relationship with Silvia and/or Arthur and had influenced Arthur's testimony against petitioner. The statements were not admitted to prove that Silvia received a letter from petitioner that was threatening, and, in any event, the record indicates there was nothing threatening in the contents of the letter. Nor were Silvia's statements admitted to prove petitioner was guilty of murdering the victims. Similar to the confession admitted in *Tennessee v. Street*, 471 U.S. 410-414, Silvia's statements were only admitted as rebuttal evidence to explain why Agent Bird had significant contacts with Silvia. Because the statements were admitted for a non-hearsay purpose, the Confrontation Clause was not implicated. It is therefore irrelevant whether the statements qualify as "testimonial" under *Crawford v. Washington*, 541 U.S. 36, or *Davis v. Washington*, 547 U.S. 812, because of the circumstances in which the statements were made (*i.e.*, the statements were made by Silvia to a law enforcement officer as part of an investigation into the circumstances of the letter and the possible connection of the letter to the case against petitioner while no emergency was in progress). In other words, the statements were not admitted in violation of petitioner's rights under the Confrontation Clause.

Even if the admission of Silvia's statements through the testimony of Agent Bird did violate petitioner's rights under the Confrontation Clause, petitioner would not be entitled to habeas relief. "A showing of constitutional error under the Sixth Amendment only merits grant of the petition for habeas corpus if the error was not harmless, that is, if it had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Holley v. Yarborough*, 568 F.3d 1091, 1100 (9th Cir. 2009), quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). In this regard, this Court cannot disagree with the California Court of Appeal's conclusion that the admission of Agent Bird's rebuttal testimony was "harmless under any standard of prejudice," because the evidence of petitioner's guilt was "overwhelming." [Doc. No. 14-15, at p. 26.] As summarized above, the eyewitness and other testimony against petitioner was not only overwhelming but very convincing despite the credibility and other issues raised by the defense.

Therefore, under the circumstances presented, it is apparent that the state court's denial of petitioner's Confrontation Clause claim was not contrary to clearly established Supreme Court law. Accordingly, IT IS RECOMMENDED that the District Court DENY petitioner's Confrontation Clause claim.

### ***CONCLUSION AND RECOMMENDATION***

This Report and Recommendation is submitted to the assigned United States District Judge pursuant to Title 28, United States Code, Section 636(b), and Civil Local Rules 72.1(d) and HC.2 of the United States District Court for the Southern District of California.

Based on the parties' moving and opposing papers and exhibits, IT IS HEREBY RECOMMENDED that the District Court issue an order: (1) approving and adopting this Report and Recommendation; and (2) directing that judgment be entered DENYING the Petition.

IT IS HEREBY ORDERED that no later than ***January 19, 2018*** any party to this action may file and serve written objections to this Report and Recommendation. The document should be captioned "Objection to Report and Recommendation.

IT IS FURTHER ORDERED that any reply to the objection shall be filed and served no later than ***February 2, 2018***. The parties are advised that failure to file objections with the specified time may waive the right to raise those objections on appear of this Court order. *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: December 13, 2017

Hon. Karen S. Crawford
United States Magistrate Judge